KJ:GSG
F.#2004R01758

# 04 1515 M

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -

MOSHE LEVI,
    also known as "Hugo,"
ANDY LNU,
FNU LNU,
ZHORA MUSHAYEV,
ISRAEL SERUYA,
    also known as "Izzy,"
PINKAS SCHAPIRA, and
FRANK UFELE,

        Defendants.

- - - - - - - - - - - - - - -X

**FILED UNDER SEAL**

AFFIDAVIT IN SUPPORT
OF ARREST WARRANTS

(T. 18, U.S.C., §§ 371,
1344 and 1956(h))

EASTERN DISTRICT OF NEW YORK, SS:

        ERIK ROSENBLATT, being duly sworn, deposes and says

that he is a Special Agent with the Department of Homeland

Security, Immigration and Customs Enforcement ("ICE"), assigned

to the El Dorado Task Force ("the Task Force"), duly appointed

according to law and acting as such.

        Upon information and belief, in or about and between

July 2003 and April 2004, both dates being approximate and

inclusive, within the Eastern District of New York and elsewhere,

defendants MOSHE LEVI, also known as "Hugo," ANDY LNU, FNU LNU,

ZHORA MUSHAYEV, ISRAEL SERUYA, also known as "Izzy," FRANK UFELE,

did knowingly and intentionally conspire to execute and attempt to execute a scheme and artifice to defraud financial institutions, and to obtain money, funds and credits owned by and under the custody and control of financial institutions, the deposits of which were insured by the Federal Deposit Insurance Corporation, by means of materially false and fraudulent pretenses, representations and promises, in violation of Title 18, United States Code, Section 1344.

(Title 18, United States Code, Section 371)

Upon information and belief, in or about and between March 2004 and April 2004, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, defendants ISRAEL SERUYA, also known as "Izzy," MOSHE LEVI, also known as "Hugo," and PINKAS SCHAPIRA did knowingly and intentionally conspire to conduct financial transactions affecting interstate and foreign commerce involving property, to wit: $130,000 in United States currency represented by a person at the direction of, and with the approval of, a Federal Official authorized to investigate violations of Title 18, United States Code, Section 1956, to be the proceeds of specified unlawful activity, to wit: narcotics trafficking, by converting the property to wire transfers and cashier's checks, knowing that the transactions were designed in whole or in part to conceal and disguise the nature, the location, the source, ownership and

3

control of the property believed to be the proceeds of such specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(3)(B).

(Title 18, United States Code, Section 1956(h)).

The source of my information and grounds for my beliefs are as follows:

INTRODUCTION

A.  Sources of Information

1.  I have been a Special Agent with ICE for approximately 6 years and am currently assigned to the Task Force, which investigates money laundering and other financial crimes.  Through my work with the Task Force and other law enforcement positions, I have participated in a number of bank fraud and money laundering investigations, during the course of which I have conducted physical surveillance, executed court-authorized search warrants, interviewed witnesses, reviewed extensive documents obtained through the execution of search warrants and the service of subpoenas, debriefed informants, reviewed taped conversations between confidential informants and defendants, and used other investigative techniques to secure relevant information for use in criminal prosecutions.

2.  My knowledge of the information set forth in this affidavit is based upon: my personal participation in this investigation and in numerous other bank fraud and money

laundering investigations; my review of records and reports; my discussions with witnesses and victims; my review of tape-recorded conversations between a reliable cooperating witness ("CW")[1] and the defendants; my review of recorded conversations between an undercover Task Force agent and a defendant; my conversations with other law enforcement agents involved in this investigation and similar investigations; my conversations with and review of information provided by financial institutions pursuant to subpoenas; and my law enforcement experience and training.

3. Because this affidavit is being submitted for the limited purpose of establishing probable cause to support the issuance of arrest warrants, it does not include all of the facts I have learned during the course of this investigation. Where actions, conversations and statements of others are reported in this affidavit, they are reported in substance and in part unless otherwise indicated. Additionally, except as explicitly set forth herein, I have not distinguished in this affidavit between facts of which I have personal knowledge and facts as to which I have hearsay or second-hand knowledge.

---

[1] The CW has provided Task Force agents with reliable information for the past year and a half. The information provided by the CW in this case has also been corroborated by other sources. In addition, information provided by the CW has led to the indictment and issuance of arrest warrants for defendants in another bank fraud scheme. The CW has also plead guilty to bank fraud and is awaiting sentencing.

B. Background on Money Laundering

4. Money laundering is the term given to financial transactions which have as their purpose, among other things, the concealment of funds which were generated by illegal activity and the efforts undertaken to give those funds the appearance of legitimacy.

5. In the United States, one criminal activity which generates among the largest amount of illicit funds, and therefore, among the largest amount of funds which require laundering, is drug trafficking. Most cocaine is produced in South America, which is also a major producer of heroin. The United States is the world's largest cocaine market. Cocaine and heroin are smuggled into the United States and sold almost exclusively for cash. In addition, most of the drug MDMA, which is commonly known as "ecstasy," is produced in Europe. Like cocaine and heroin, it is also smuggled into the United States and sold for cash. Thus, drug trafficking results in a vast amount of United States currency, which must be laundered.

6. In the case of drug trafficking, the money launderer plays an integral role because drug trafficking generates such a high volume of currency, mainly in small denominations. This creates a problem for the trafficker because the bulk and weight of the currency makes it very difficult to transport and conceal.

7.   The money launderer's primary role is to take the money generated by trafficking and convert it to more easily concealable and transportable forms or to get the money into the banking system.   The process of money laundering begins with the placement process, i.e., the initial placement of the currency into the banking system or the conversion of the currency into a form generated by the banking system, such as the purchase of money orders, cashier's checks, or through wire transfers, etc. The purpose of the money laundering is to perform this service without getting caught by law enforcement.

8.   The methods used in money laundering are limited only by the creativity of the money launderer.   One particular method is to convert large amounts of cash into checks, cashier's checks or money orders.   For example, large amounts of cash may be deposited by the money launderer into accounts of sham businesses specifically created by the money launderer to launder money or into the accounts of a collusive business that typically makes large cash deposits and is controlled by the money launderer.   The money launderer then provides either a check, cashier's check or money order to the individual seeking to have drug proceeds laundered, less a laundering fee of typically between 4% to 5%.   This method avoids scrutiny by banking officials when these checks or money orders are later deposited

and makes it easier to transport large amounts of money out of
the United States to continue the drug trafficking cycle.

9.   For the purposes of the money laundering statute, a
person commits a money laundering offense when he or she, for
example, conducts a financial transaction knowing that monies
involved in the transaction are from some illegal source and
knowing that the transaction is designed in whole or in part to
conceal or disguise the nature, the location or true source or
ownership of the funds.  Such financial transactions include the
movement of funds by wire, exchanging one form of monetary
instrument for another, transferring title to any real property,
or other vehicle or vessel, or transactions involving the use of
a financial institution which is engaged in or which transactions
affect interstate or foreign commerce.

### THE INVESTIGATION

10.   In early 2003, another Task Force investigation in
which I was involved revealed suspicious banking activity
involving defendant ISRAEL SERUYA and a company he owned called
Worldwide Communications, which is located at 1051 Southern
Boulevard, Bronx, New York.  Through that investigation, I also
learned that defendant MOSHE LEVI and a company that he
controlled called Worldwide Oriental Rugs, located at 1574 East
3rd Street, Brooklyn, New York, may also be involved in bank
fraud and other financial crimes.  Subsequently, the CW informed

me that he has known defendant SERUYA for approximately 20 years and defendant LEVI for approximately 4 years. He also told me that defendants SERUYA and LEVI process counterfeit and stolen checks and launder the proceeds of illegal activities. The CW further informed me that he is aware that defendants SERUYA and LEVI have used the above-named businesses for these purposes and that he has personally been involved in transactions involving counterfeit and stolen checks with SERUYA and LEVI since 2002.

11. Also in early 2003, the CW informed me that defendant FRANK UFELE is a source of stolen and counterfeit checks. He also told me that defendant UFELE has passed stolen and counterfeit checks through defendant ISRAEL SERUYA in the past. The CW has further stated that he brokered one such transaction between UFELE and SERUYA in 2002.

A.  The 27 Star Diamond Bank Fraud

12. On July 29, 2003, the CW met with defendants FRANK UFELE, ISRAEL SERUYA, MOSHE LEVI, ZHORA MUSHAYEV and an unidentified individual in the vicinity of Hillside Avenue and 202nd Street in Queens, New York to discuss the passing of stolen and counterfeit checks. During this consensually recorded meeting which was surveilled by Task Force agents, defendants SERUYA and LEVI introduced the CW and defendant UFELE to defendant MUSHAYEV for this purpose. MUSHAYEV is the owner of 27 Star Diamond, Inc., located at 108-15 63rd Drive, Forest Hills,

New York, also MUSHAYEV's home address.  At the conclusion of
this meeting, the CW and UFELE agreed to talk to defendants
SERUYA, LEVI, and MUSHAYEV at a later date when they (UFELE and
the CW) had stolen or counterfeit checks that needed to be
cashed.

13.  On August 14, 2003, the CW met with defendant
FRANK UFELE.  During this consensually recorded meeting which was
surveilled by Task Force agents, UFELE informed the CW that he
had received a stolen check worth $10,200 from defendant ANDY LNU
drawn on a J.P. Morgan Chase ("Chase") account in the name of
"American Capital Access Service Corporation" and made payable to
"McKee Nelson, LLP" (hereinafter the "American Capital Check").
During this conversation, UFELE used his cellular telephone and
contacted defendant ANDY LNU.  After speaking to ANDY LNU for a
moment, UFELE passed his cellular telephone to the CW who
received additional instructions from ANDY LNU on cashing the
stolen American Capital Check.  Specifically, ANDY LNU informed
the CW that he had a source for stolen checks inside of Chase and
instructed the CW to have the American Capital Check deposited
for him.  The CW has met ANDY LNU on previous and subsequent
occasions and knows him to be a source of counterfeit and stolen
checks, and specifically the source of the American Capital Check
as described above.

14.   Also during this meeting on August 14, 2003,
defendant FRANK UFELE informed the CW that he (UFELE) also had a
stolen blank check drawn on a bank account at Washington Mutual
Bank belonging to Donald and Janice Holve (hereinafter the "Holve
Check").   UFELE then informed the CW that up to $25,000 could be
drawn on the Holve Check since it initially had a balance of
$75,000 and approximately $50,000 had already been withdrawn from
it.   UFELE next instructed the CW to use defendant ISRAEL SERUYA
and SERUYA's connections to have the American Capital Check
deposited and cashed for ANDY LNU and the Holve Check deposited
and cashed for him (UFELE).   Subsequently, the CW made
arrangements to meet with defendant SERUYA for this purpose.

15.   Consequently, on August 19, 2003, the CW met with
defendants ISRAEL SERUYA and MOSHE LEVI in the vicinity of
Hillside Avenue and 202nd Street in Queens, New York.   During
this consensually recorded meeting, which was surveilled by Task
Force agents, the CW provided defendants SERUYA and LEVI with the
stolen American Capital Check and the stolen Holve Check that he
had received from defendant FRANK UFELE.   During this meeting,
the CW informed defendants SERUYA and LEVI that no more than
$25,000 could be drawn on the Holve Check.   SERUYA and LEVI
agreed to pass the two stolen checks to defendant ZHORA MUSHAYEV
that evening so it could be deposited in MUSHAYEV's 27 Star
Diamond account at HSBC Bank the following morning.   After this

meeting, Task Force agents followed LEVI's blue Volvo station wagon to the vicinity of the Beautiful Bukhara Restaurant, 64-47 108th Street, Forest Hills, New York and observed defendants SERUYA and LEVI meet with a white male matching the physical description of defendant MUSHAYEV.

16. Based on my review of bank records provided by HSBC Bank and my conversations with HSBC Bank employees, defendant ZHORA MUSHAYEV deposited the Holve Check into the 27 Star Diamond, Inc. account at the HSBC Bank branch in Forest Hills, New York on August 20, 2003. Specifically, the check was made payable to 27 Star Diamond, Inc. in the amount of $24,500 and had been purportedly signed by "Donald J. Holve." MUSHAYEV, however, was unable to deposit the American Capital Check because the HSBC Bank teller would not accept the third-party check.

17. On August 20, 2003, the CW met with defendants ISRAEL SERUYA and ZHORA MUSHAYEV at World Wide Communications in the Bronx, New York. During this consensually recorded meeting which was also surveilled by Task Force agents, SERUYA and MUSHAYEV provided the CW with photocopies of the Holve Check and an accompanying deposit ticket. Additionally, MUSHAYEV informed the CW that he was unable to deposit the American Capital Check because HSBC Bank did not accept third-party checks. At that time, MUSHAYEV returned the American Capital Check to the CW. At the conclusion of this meeting, the CW, SERUYA and MUSHAYEV

discussed additional bank fraud opportunities as well as potential money laundering transactions.

18.  Following this meeting, the CW provided me with the photocopies that defendant ZHORA MUSHAYEV had provided to him.  My analysis of the photocopy of the Holve Check revealed that it had been backdated to August 18, 2003 and confirmed that it had been made payable to 27 Star Diamond, Inc. in the amount of $24,500.  The word "Diamonds" also appears in the memo line of the Holve Check and it was signed, purportedly by "Donald J. Holve."

19.  Based on information provided to me by Washington Mutual Bank, the Holve Check was stolen and there had been a recent, large withdrawal from the Holve's account.  According to Washington Mutual Bank, someone had telephoned them, referenced the Holve's account number, and asked Washington Mutual Bank to have new checks sent to an address in the Bronx, New York.  However, before the amount of the Holve Check could successfully be drawn from the Holve's account, I arranged with HSBC Bank and Washington Mutual Bank employees to stop payment on it.

20.  The Holves have also provided Washington Mutual Bank representatives with an affidavit stating that between August 11, 2003 and August 19, 2003, three checks from their account with Washington Mutual had been fraudulently negotiated for a total loss of $60,199.30.

13

21.   Additionally, Chase confirmed that the American Capital Check had been stolen and stopped payment on it.

22.   Through my investigation, I have learned that Chase, Washington Mutual Bank, and HSBC Bank are all financial institutions, the deposits of which are insured by the Federal Deposit Insurance Corporation.

B.   Laundering of $30,000 in Ecstasy Trafficking Proceeds

23.   On March 17, 2004, the CW met with defendants ISRAEL SERUYA and MOSHE LEVI at the T.G.I. Friday's Restaurant located at 825 Central Park Avenue, Scarsdale, New York.   During this meeting which was surveilled by Task Force agents, the three discussed the laundering of ecstasy trafficking proceeds.   During this conversation, at the direction of Task Force agents, the CW advised SERUYA and LEVI that he needed to launder the proceeds of ecstasy trafficking for an individual named "Edwin."   The CW further stated that Edwin was working with a London, England-based organization that purchases ecstasy in Amsterdam at $5 per pill and then uses couriers to transport the ecstasy to London, England, where it is then shipped by commercial container to New York City and ultimately sold for $9 per pill.   The CW then stated that Edwin collects the proceeds from the ecstasy sales in New York City and launders them through various sources.   After the ecstasy proceeds are washed, the CW informed SERUYA and LEVI

that the money is sent back to London, England to further the
ecstasy trafficking cycle.

24.  During this conversation, defendants ISRAEL SERUYA
and MOSHE LEVI both expressed an interest in not only laundering
the ecstasy proceeds, but also in investing their own funds into
the ecstasy trafficking cycle.  Specifically, SERUYA indicated
that he was interested in investing $30,000 in the ecstasy
trafficking cycle described by the CW.  According to SERUYA, the
ecstasy pills could be sold for $10 per pill in New York City to
increase the profit.  Also during this conversation, LEVI
suggested that he had a source in Amsterdam whom he had worked
with in 2001 that could provide ecstasy for $3 per pill.

25.  Subsequently, during a consensually recorded,
three-way telephone conversation on March 18, 2004, the CW, at
the direction of Task Force agents, negotiated a money laundering
transaction with defendants ISRAEL SERUYA and MOSHE LEVI.  During
this conversation, LEVI demanded a rate of 25% to launder ecstasy
proceeds due to, according to LEVI, the measure of security that
he and SERUYA would provide in the event of any inquiry by bank
officials.  In response, the CW advised SERUYA and LEVI that 5%
is the maximum rate for laundering drug proceeds.

26.  On March 19, 2004, the CW met with defendant
ISRAEL SERUYA at a clothing store he owns called DEALS!, which is
located at 65 Bedford Avenue, Brooklyn, New York.  After a brief

conversation with SERUYA outside of DEALS!, the CW, driving his own automobile, followed SERUYA, who was driving his 2000 GMC, to the vicinity of 805 Avenue M, Brooklyn, New York, where SERUYA parked his car. After parking his car, SERUYA entered the CW's car and then instructed the CW to drive to the area of Avenue U and 21st Street, in Brooklyn, New York. After arriving at Avenue U and 21st Street, the CW and SERUYA exited the CW's car and walked towards North Fork Bank Branch #940 located at 2123 Avenue U, where they were met by defendant MOSHE LEVI. The three then confirmed the 5% laundering fee and the CW provided LEVI with a backpack containing $30,000 in United States currency represented to be the proceeds of ecstasy trafficking. LEVI then opened the rear hatch of his car, placed the backpack in the rear of his car, and then transferred the $30,000 to a white plastic bag. The CW then provided LEVI with the name of a business in which he should have a cashier's check made. Specifically, the CW provided LEVI with the name of "Cobra Investments," an undercover business controlled by Task Force agents. LEVI then entered the North Fork Bank branch while SERUYA waited in the ATM vestibule with the CW. A short time later, LEVI returned and provided the CW with a North Fork Bank cashier's check made to "Cobra Investments," dated March 19, 2004 and in the amount of $28,500 (which represented the $30,000 less the 5% laundering fee charged by SERUYA and LEVI). The above conversations involving the CW

were consensually recorded. Additionally, I along with other
Task Force agents surveilled this transaction.

C. Laundering of $100,000 in Ecstasy Trafficking Proceeds

27. On April 14, 2004, the CW, under the observation
of Task Force agents, drove to meet defendant ISRAEL SERUYA at
his business DEALS! in Brooklyn, New York for a previously
arranged meeting. Based on prior discussions, the CW was to
provide SERUYA with $100,000 in United States currency
represented to be the proceeds of ecstasy trafficking at this
meeting for SERUYA to launder. Accordingly, Task Force agents
provided the CW with $100,000 United States currency concealed
within a green backpack prior to this meeting. After a brief
consensually recorded conversation with the CW at DEALS!, SERUYA
entered the CW's vehicle and provided the CW with verbal driving
instructions to the area of 10 Grand Avenue, Brooklyn, New York.
Task Force agents maintained surveillance of CW and SERUYA as
they drove to the Grand Avenue address. While in the vehicle,
SERUYA viewed the cash contained in the backpack and withdrew his
5% commission ($5,000) for laundering the $100,000 in ecstasy
proceeds. In addition, the CW instructed SERUYA to return the
laundered proceeds in the form of a cashier's check in the name
of "Cobra Investments." The CW and SERUYA also engaged in a
consensually recorded conversation about ecstasy trafficking and

the source of the $100,000 during the drive to the Grand Avenue
address.

28. Upon arriving at the Grand Avenue address, Task
Force agents observed defendant ISRAEL SERUYA exit the CW's
vehicle with the green backpack containing $95,000 (the $100,000
less SERUYA's 5% laundering fee) and enter TWA Trading located at
10 Grand Avenue, Brooklyn, New York. A short time later, SERUYA
exited TWA Trading without the green backpack and returned to the
CW's vehicle. SERUYA then informed the CW that the laundered
money would be returned later in the day.

29. Task Force agents, however, maintained
surveillance of TWA Trading after defendant ISRAEL SERUYA left
the green backpack containing the $95,000 there. Later that same
afternoon, Task Force agents observed a Hasidic male exiting a
blue Chrysler minivan, bearing New York state license plate VPA05
and entering TWA Trading. Based on subsequent investigation by
Task Force agents, I learned that New York state license plate
VPA05 is associated with a 2002 Chrysler minivan registered to
defendant PINKAS SCHAPIRA. Additionally, the subsequent
investigation revealed that SCHAPIRA is registered as the owner
of TWA Trading located at 10 Grand Avenue, Brooklyn, New York.

30. At approximately 4:30 p.m. that same afternoon,
Task Force agents observed an unknown Hasidic male leaving TWA
Trading, carrying the green backpack that defendant ISRAEL SERUYA

18

had dropped-off earlier that day containing the $95,000. The
unidentified male then entered a blue van bearing New York
license plate ACL-2516, which my investigation revealed was
registered to Laser Tone Corporation located at 1-02 26th Avenue,
Long Island City, New York. At approximately 5:08 p.m. that
evening, Task Force agents observed the blue van enter a garage
at Laser Tone Corporation at the above-mentioned address.

31. At approximately 8:00 p.m. that same evening, the
CW met with defendant ISRAEL SERUYA near a restaurant on Kings
Highway in Brooklyn, New York. The CW and SERUYA entered
SERUYA's car and contacted defendant PINKAS SCHAPIRA using
SERUYA's cellular telephone. During this consensually recorded
conversation, SCHAPIRA informed both the CW and SERUYA that the
laundered money would be made available the following day.

32. Based on my review of defendant PINKAS SCHAPIRA
and TWA Trading's bank records as well as my surveillance, I
believe that SCHAPIRA provided the green backpack containing at
least $53,700 in United States currency to an unknown individual
associated with Laser Tone Corporation. Specifically, bank
records reveal that TWA Trading received two wire transfers on
April 15, 2004, one from Laser Tone Corporation in the amount of
$53,700, and one from Valley Supplies, Inc. in the amount of
$28,000.05. Thereafter, on April 15, 2004, SCHAPIRA obtained a
cashier's check from M&T Bank for $53,800, $100 more than the

amount of the Laser Tone Corporation wire transfer that
SCHAPIRA's company TWA Trading received earlier that day.
Subsequently, on April 16, 2004, SCHAPIRA obtained a cashier's
check from M&T Bank for $28,000, an amount only five cents less
than the Valley Supplies, Inc. wire transfer to TWA Trading the
previous day. As described below, these cashier's checks were
subsequently provided to defendant ISRAEL SERUYA and to the CW.

33. On April 15, 2004, the CW placed a consensually
recorded telephone call to defendant ISRAEL SERUYA who instructed
the CW to meet him at his business, DEALS! in Brooklyn, New York
to pick-up a cashier's check. At approximately 6:15 p.m., a Task
Force agent acting in an undercover capacity ("UC"), entered
DEALS! and met with SERUYA who handed the UC an envelope
containing a cashier's check in the amount of $53,800. The UC
then asked SERUYA about the balance of the $95,000 and SERUYA
informed him that a second check would be available, the
following day. The cashier's check that SERUYA provided the UC
was issued by M&T Bank on April 15, 2004 and was drawn on account
belonging to TWA Trading. It was made payable to "Cora
Investment" [sic] in the amount of $53,800.

34. On the following day, April 16, 2004, defendant
ISRAEL SERUYA instructed the CW to pick-up the second cashier's
check at Monroe Buses, located at 60 Nostrand Avenue, Brooklyn,
New York. At approximately 2:45 p.m. that afternoon, the CW

arrived at Monroe Buses.  After asking to speak with "Pinkas," a clerk at Monroe Buses responded by providing the CW with an envelope containing a cashier's check in the amount of \$28,000. This cashier's check was issued by M&T Bank on April 16, 2004 and was drawn on account belonging to TWA Trading.  It was made payable to "Cora Investment" [sic] in the amount of \$28,000.

35.  Upon receiving this cashier's check, the CW called defendant ISRAEL SERUYA to advise him that there was a discrepancy of \$13,200 as the cashier's check should have been in the amount of \$41,200.  SERUYA then advised the CW that he (SERUYA) owes defendant PINKAS SCHAPIRA money from their normal business activity, and that SCHAPIRA may have deducted this amount from the \$95,000 in laundered funds that were to be provided to the CW.  Sometime later, SERUYA informed the CW that he had spoken with SCHAPIRA, and that SCHAPIRA informed him that he would not return the balance of the laundered funds to the CW.

36.  On April 20, 2004, the CW, at the direction of Task Force agents, unsuccessfully attempted to contact defendant PINKAS SCHAPIRA at his cellular telephone number.  On April 21, 2004, at the direction of Task Force agents, the CW made a three-way call to SCHAPIRA, with me remotely monitoring the call. During this conversation, SCHAPIRA informed the CW that the matter concerning the missing funds was between him (SCHAPIRA) and defendant ISRAEL SERUYA.  After the CW reiterated that the

$13,800 that SCHAPIRA refused to provide the CW was related to drug trafficking, SCHAPIRA stated, in sum and substance, "I don't care if this money is from God or drugs, its not my problem."

37.  On April 22, 2004, the CW, at the direction of Task Force agents, once again contacted defendant PINKAS SCHAPIRA on his cellular telephone number and engaged in a conversation about the source of the money that SCHAPIRA had laundered and refused to turn over to the CW.  The CW again confirmed with SCHAPIRA that the money that he laundered and was refusing to return to him was from drug trafficking.  SCHAPIRA once again indicated that he did not care about the source of the money and that he would not turn it over to the CW.

38.  On or about April 26, 2004, defendant ISRAEL SERUYA agreed to repay the CW the balance of $13,200 in laundered funds that defendant PINKAS SCHAPIRA refused to turn over to the CW.  During the ensuing months, SERUYA made the following cash payments to CW and various undercover Task Force agents: $3,000 on April 27, 2004; $2,899 on May 3, 2004; $2,000 on May 24, 2004; $2,500 on June 9, 2004; and $3,000 on June 18, 2004.

C.  The Stolen Bank of America Line of Credit Checks

39.  On or about March 29, 2004, the CW, at the direction of defendant FRANK UFELE, spoke with defendant MOSHE LEVI to discuss additional stolen checks that UFELE wished to pass through bank accounts controlled by LEVI or his associates.

At that time, LEVI provided the CW with account information for Advanta Corporation Limited, 82 Whitchurch Rd, Cardiff, CF 14 3XL, London.  This information was typed on paper and included the English and Russian language.  The corresponding bank was listed as Citybank [sic] N.A., New York, USA SWIFT: CWTIUS33 to benefit AO UKIO Bankas, account #30112840400010000005, SWIFT: UKIOLT2X.  Additionally, LEVI instructed CW to use this account to deposit any stolen or counterfeit checks.  Subsequently, the CW provided this information to UFELE.

40.  After being contacted by defendant FRANK UFELE, the CW arranged a meeting with defendant MOSHE LEVI at UFELE's request.  On April 20, 2004, the CW met with UFELE at Gaby's Pizzeria, 20423 Hillside Ave., Hollis, New York.  This consensually recorded meeting was also surveilled by Task Force agents.  While at Gaby's, UFELE and the CW had a brief conversation concerning additional stolen checks that UFELE wanted to pass to LEVI to be cashed for a fee.  Following this brief conversation, the CW and UFELE went to a stationary store located next door to Gaby's and photocopied two checks that would be passed from UFELE to LEVI.  One of these checks was drawn on a line of credit at Bank of America, N.A. ("Bank of America") belonging to "Anthony N. Konstantinidis and Joanne M. Konstantinidis" and was made payable to "Advanta Corp." in the amount of $156,400.  The other check was drawn on a line of

credit at Bank of America belonging to "Jack S. Middlebrooks and
Linda R. Middlebrooks" and was made payable to "Advanta Corp." in
the amount of $252,200.  UFELE then provided photocopies of these
checks to the CW.

41.  After returning to Gaby's and identifying two
plainclothes police officers eating there, defendant FRANK UFELE
insisted that he and the CW go elsewhere.  UFELE and the CW then
exited Gaby's Pizzeria, and entered a late model Lexus ES 300
four-door that was parked immediately outside the store.  The
vehicle was already occupied by the driver, defendant FNU LNU, an
unidentified male.  After a brief stop at a restaurant named The
Golden Crust, 168th Street and Hillside Ave, Queens, New York,
all three occupants traveled to the corner of Hillside Ave and
165th Street, Queens, New York, and parked.

42.  At approximately 8:12 p.m. that evening, defendant
MOSHE LEVI pulled-up behind the Lexus in a Volvo station wagon.
Task Force agents subsequently observed the CW exit the Lexus and
enter LEVI's vehicle.  Thereafter, defendant FNU LNU and
defendant FRANK UFELE drove off in the Lexus.  The CW and LEVI
then proceeded to follow them to area of 165th Street and Hyland
Avenue in Queens, New York.  All individuals exited their
vehicles at this location and entered a public area to sit on
benches.  Task Force agents surveilled this meeting which was
also consensually recorded.

43.    According to the CW and based on the observation
of Task Force agents and my review of the consensual recording of
this meeting, the following was discussed in sum and substance by
the participants.  According to defendant FRANK UFELE, defendant
FNU LNU had access to stolen line of credit checks and had
several in his possession.  Thereafter, defendant MOSHE LEVI
indicated that, with the assistance of defendant ISRAEL SERUYA,
he will provide the stolen line of credit checks to an unknown
Russian male, who will then pass them to a contact outside the
country.  According to LEVI, the stolen line of credit checks
would be cashed in Russia, and the proceeds would subsequently be
transferred to LEVI.  LEVI further stated that he and SERUYA
would take 40% of the return as a fee for processing the stolen
checks.  According to defendant FNU LNU, the source of the stolen
line of credit checks is a "newly formed group" and they are
guaranteed to clear.  He also informed LEVI that "if you have 5
accounts, we have 5 checks, if you have 10, we have 10."

44.    Defendant FNU LNU, in the presence of defendants
FRANK UFELE, MOSHE LEVI and the CW, then telephoned a automated
banking system on his cellular telephone and the account balance
on one of the stolen line of credit checks in his possession was
stated to be approximately $252,220.  At that time, UFELE passed
the two stolen line of credit checks to LEVI to be cashed by him
for a fee.

  
45.   Following this meeting, the CW retained photocopies of these stolen line of credit checks that defendant FRANK UFELE provided to him earlier that evening at the stationery store.  Before these checks could be cashed however, Task Force agents notified Bank of America officials and arranged to have the victims notified and their accounts closed.

46.   Through my investigation, I have learned that Bank of America is a financial institution, the deposits of which are insured by the Federal Deposit Insurance Corporation.

WHEREFORE, your deponent respectfully requests that arrest warrants be issued for defendants MOSHE LEVI, also known as "Hugo," ANDY LNU, FNU LNU, ZHORA MUSHAYEV, ISRAEL SERUYA, also known as "Izzy," PINKAS SCHAPIRA, and FRANK UFELE, and so that they may be dealt with according to law.

ERIK ROSENBLATT
Special Agent
United States Immigration and Customs
Enforcement


Sworn to before me this
___th day of November, 2004

UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK